SIMS v. STATE.

4248                                              159 S. W. 2d 753

Opinion delivered March 9, 1942.

*Claude M. Cruce* and *James Merritt,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J.    Appellant was sentenced to serve ten years in prison when a jury found him guilty of assault upon the person of his wife, with intent to kill. A .38 calibre pistol was used as a weapon.

Appellant came from near Jackson, Mississippi, where his father lived, for the purpose, as he claims, of

persuading his wife to disregard difficulties they had formerly had and to resume the marital relationship.

The shooting occurred at the home of W. A. Roe. Woodrow Sedberry is Roe's son-in-law. Appellant's wife is Sedberry's sister.

The night before Mrs. Sims was shot, appellant appeared at the home of Clarence Pruitt between 12:30 and 1:00 o'clock and asked the way to Sedberry's home. During a brief conversation appellant told Pruitt his wife had "run off" two or three months ago, and he was hunting her. Appellant was seen the same night by Jim Gibson, at whose home he called, and where he exhibited a pistol with the explanation that he was carrying it for protection.

Sedberry, with others, was at Roe's home when appellant appeared about noon. There was testimony that appellant was carrying his shoes, and when asked to "come in," he stepped up on the porch and said he wanted to see Carlene, his wife. Carlene came out of the house. Husband and wife walked a few steps into the yard. According to Sedberry, appellant called and asked that he go with them. The couple stopped in the shade of a tree and Sedberry walked past them. Appellant asked his wife if she would go back with him, and received a negative reply. As Carlene refused, appellant reached in his pocket, procured a note, and handed it to her. She sat down and read it, then got up and told appellant again that she was not going with him.

According to Sedberry's testimony, Carlene then started toward the house, and appellant again asked her to go with him, and received the same reply. Appellant then reached under his coat, "or somewhere," with his right hand and drew a pistol. Carlene began running, with appellant in close pursuit. When appellant said he was going to shoot Carlene, Sedberry started toward them. At this point appellant fired. He was then about six feet from Carlene. Sedberry's testimony is that appellant was preparing to fire a second shot when he "tripped" him. Appellant and Sedberry were on the ground together, wrestling for possession of the pistol,

Appellant turned the gun on Sedberry, and the latter hurriedly disengaged himself. The two men arose. Appellant, still threatening Carlene with the pistol, forced her to accompany him, and together they walked away. She had been shot in one shoulder.

In substance, other witnesses testified to the same facts.

Appellant's version of the difficulty was that when he approached the Roe home, Sedberry and John Henry Roe (the latter being a son of W. A. Roe) had guns, and said they had started squirrel hunting.[1] Appellant says he stood and talked with Roe and Sedberry briefly, then stepped up on the porch:—"My wife came out and we walked to where there were some home-made boards. She jumped up on the board pile and began picking at me. I was picking at her—like two children, I reckon. We were laughing and talking. She read the note[2] and laid it down. I touched her—you have seen people that are ticklish—I touched her and did she kick at me. Directly she jumped down and acted like she was going to grab me on the leg: we always 'tussled' with one another that way. Instead of grabbing me by the leg she grabbed my gun to take it away from me. When she grabbed it, naturally I grabbed it, too, and we were wrestling over it on the board pile. She 'hollered' something or other to Woodrow and he hit me right then, and it felt like a house hit me. That is the last I recall until I was

---

[1] John Roe's testimony corroborated appellant in part, saying he and Sedberry had started for the woods when they met appellant. He said: "We were going out there to kill a bird. We each had .22 rifles. We met Sims at the gate, about 100 yards from the front porch. I came back with him to the house. When he came back to the house we just asked him in, and he went and sat down. . . . Sims and his wife went out to talk; it was near a board pile, about 30 yards, I guess, from the front porch. . . . I had put the rifle in the house. . . . When Sims got his gun and started to shoot Carlene, Woodrow made for him and tripped him. Woodrow got there about the time the gun shot. Sims was not shooting at Woodrow: he was shooting at his wife. . . ."

[2] The note had been written by appellant's mother, begging her daughter-in-law to return. Appellant married Carlene in 1940. He had four children by a prior marriage, ages 8, 10, 14 and 19 years.

getting off the ground and my wife called me and told me she was shot."[3]

Whether appellant intended to shoot Carlene was a question for the jury, in view of the conflict in testimony. The trial court thought "the sole question of fact" was whether the defendant was guilty "of the crime of assault with intent to kill," or whether he was innocent. The jury was so instructed. This was not error.

It is true that one being tried for assault with intent to kill may be found guilty of aggravated assault. But this consequence is dependent upon evidence. As was said by Chief Justice COCKRILL in *Smith* v. *State*, 50 Ark. 545, 8 S. W. 941, "in determining whether the court ought or ought not to have instructed the jury on the question of a lower offense included in the greater charge, we look to the record only to see if there is any testimony to base it on."

Appellant testified that the shooting was accidental. If so, he was innocent. But if the state's witnesses are to be believed, appellant deliberately fired at his fleeing wife with a .38 calibre Colt revolver at a distance of about six feet. Few rules of criminal law have been more often repeated than that "Everyone is presumed to intend the natural consequence of his act; and though a specific intent may not exist in the mind, the law will imply an intent to produce the effect, when it is the natural and probable consequence of the act." *Howard* v. *State*, 34 Ark. 433.

Exceptions are made to other instructions, but we do not regard the matters complained of as prejudicial.

---

[3] Continuing his testimony, appellant said: "I asked her where she was shot. She took a handkerchief out of my pocket and put it on the place on the edge of her shoulder and fixed a bandage on it. She then asked me to carry her to a doctor, and I told her 'all right, let's go.' I proceeded then to carry her to Lake Village to a hospital. I had no animosity or ill will toward her at the time. I didn't intend to shoot her. . . . The shooting was purely accidental. . . . I didn't make any effort to shoot Woodrow. There was nothing to keep me from shooting him if I had wanted to. . . . After I got up my wife and I walked down to Walter Shertlief's about a mile and a half, or two miles from the place where the accident occurred. I hired him to carry me to Lake Village in a school bus. . . . The doctor gave first aid treatment and wanted to take an X-ray. He wanted her to stay there till I went home. She wanted to go over to my father's: she calls him 'Daddy'."

It is insisted that the court should have granted a new trial when affidavits were presented in a supplementary motion alleging incompetency of a juror who on his *voir dire* had stated that he could fairly and impartially pass upon the defendant's guilt or innocence.

The affiants claim to have heard conversations between jurymen during the noon recess the first day of trial. Some one in a group (of jurors and spectators, or jurors alone—the allegations do not clearly reflect which) asked what was to be done "with the man who shot his wife," and John Golden asserted he had made up his mind what *he* was going to do; that ". . . [we] are going to send him to the penitentiary. [Golden] said he was one of the jurors, and that his mind was made up when he got on the jury."

Appellant's motion for a new trial was filed October 16, almost immediately after the verdict was returned. The amended motion, with supporting affidavits, was presented to the judge in chambers at Warren November 12.

We agree with the attorney general that the new matter is not properly in the record. It was held in *Currie* v. *State*, 94 Ark. 240, 126 S. W. 842, that the Act of May 31, 1909, was not applicable to criminal cases. It provides that where a verdict is rendered within three days of the adjournment of a term of circuit court, motion for new trial with alternative prayer for appeal "may be presented to the judge after term."

The Act of 1909 appears as § 1539 of Pope's Digest, in the chapter on civil procedure. Section 4058 of the Digest applies to criminal cases. It is § 270 of the criminal code.

In *Town of Corning* v. *Thompson*, 113 Ark. 237, 168 S. W. 128, Mr. Justice Wood said for an undivided court that this statute contemplates a motion for new trial shall be made at the same term of the court at which the verdict is rendered, and it should be acted upon at that term unless *judgment* has been postponed to another term.[4]

---

[4] See *Thomas* v. *State*, 136 Ark. 290, 206 S. W. 435, where it was held that statutory provisions relating to new trial in civil cases had no application to criminal cases. [For construction of rule applicable to new trial in civil cases, see *Gazzola* v. *New*, 191 Ark. 724, 87 S. W. 2d 68; *Chicago, Rock Island & Pacific Railway Company* v. *McCoy, Administrator, ante*, p. 596, 157 S. W. 2d 761; *Mays* v. *C. M. Johnston & Sons Sand & Gravel Company, ante*, p. 779, 158 S. W. 2d 910.

Act 201, approved March 5, 1937 (Acts 1937, p. 1384), provides that circuit courts shall "always" be in session, subject to certain limitations.

Section 31 of Initiated Act No. 3 (adopted Nov. 3, 1936) directs that when any circuit court has been duly convened for a regular term, it shall remain open for all criminal proceedings until its next regular term, "and may be in session at any time the judge thereof may deem necessary." There is a provision for notice to interested parties.

The first four words of § 31 explicitly refer to *circuit courts,* as distinguished from the judge of such courts. It is then provided that the *court* may be in session at any time the *judge* deems it necessary.

Sections 1539 and 1540 of Pope's Digest were amended by Act 167, approved March 1, 1939. The amendment, however, relates to civil cases only.

Article 2, § 10, of the constitution—"Declaration of Rights"—provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed. An additional guarantee is that, conditionally, the venue may be changed to another county of the judicial district in which the indictment is found. This right is not available to the state.

Public trial by jury of charges contained in an indictment [or information] may be had only in circuit court. While Act No. 3 does not conflict with the constitution in providing when and in what circumstances circuit court may be in session for the purpose of dealing with criminal matters, it very definitely deals with the *court;* and since, where a change of venue has not been taken by the accused, his rights may be dealt with only by the circuit court of the county in which the indictment was returned, or information was filed, it follows that an order entered by the judge in a county other than that in which the defendant was tried is a nullity unless the proceeding is provided for by a statute not in conflict with the constitution.

Affirmed.